LONDON GUARANTY & ACCIDENT CO., et al., v. SIGNAL MOUNTAIN COAL MINING CO., et al.

Eastern Section.    May 27, 1932.

Petition for Certiorari denied by Supreme Court, October 14, 1932.

Williams & Frierson, Thompson & Ballard, Sizer, Chambliss & Sizer and Brown & Spurlock, all of Chattanooga, for appellant.

Allison, Lynch & Phillips and C. A. Noone, all of Chattanooga, for appellee.

THOMPSON, J.  The complainants, creditors of the Signal Mountain Coal Mining Company, filed the bill in this cause to recover their respective debts from said Company, and also and principally to hold the individual defendants jointly and severally liable therefor.  The theory upon which the complainants sought to hold the defendants liable is that the Signal Mountain Coal Mining Company was a foreign corporation doing business in this State without domestication here as required by our laws, and that said individual defendants were stockholders therein and participated in the doing of such business.

The Signal Mountain Coal Mining Company was a corporation organized under the Laws of Delaware, and it never became domesticated in this State.  It took over coal mining properties in Hamilton County and operated the same, mining and selling coal, for a period from about July, 1920, until July, 1923, when the undertaking was abandoned.  Thereafter, in October, 1923, a petition in bankruptcy was filed against it in the Federal Court at Chattanooga, which petition was pending and undetermined at the time the cause at bar went to trial.

During the period said corporation was doing business in this State, and mostly toward the last of it, said corporation incurred indebtednesses to the several complainants in the amounts respectively sued for.  The question at issue is whether or not the individual defendants are liable for the debts of the corporation sued upon.

At this time during the period above mentioned the individual defendants, except Hall, acquired shares of the preferred stock of said corporation.  With respect to the time said individual defendants acquired said preferred stock, and with respect to the part they took or did not take in the activities of said corporation, the individual defendants fall into three classes; (1) In one class are the defendants, Brockhaus, Bishop, Patten, Vance and Lupton.  These defendants all acquired their preferred stock at the same time and under the same facts and circumstances.  Lucey and Cantrell, made parties defendants to the bill, did belong in this class but they never were served with process and did not appear in the cause.  (2)  The defendants, Meehan and White, are in another class. . (3)  The defendant, Charles L. Hall, stands in a class by himself, since he at no time ever owned any stock in said corporation.

On the final hearing the Chancellor held that the defendant, Meehan, since he acted as president of the said corporation, from July 9, 1920, until August 15, 1921, was liable for the indebtedness of the complainant Farrar Lumber Company, in the sum of $2,276.53, with interest from the dates of the maturity of the trade acceptances hereinafter mentioned, which indebtedness was contracted between July 9, 1920, and August 15, 1921. The Chancellor also held that the defendant, White, was indebted to the complainant, London Guaranty & Accident Company, in the sum of $893.85, together with interest thereon from June 21, 1926, the date of the filing of the original bill, making a total of $1142.11—which indebtedness was incurred between January 1, 1923, and the time the said corporation ceased business during the spring of 1923—said White having acted as general manager of the corporation during said time. The Chancellor further held that the defendants, Brockhaus, Bishop, Patten, Vance and Lupton, were not liable for any of the complainant's indebtedness because they had never participated in any of the company's activities in this State. The Chancellor also held that the defendant, Charles L. Hall, who never owned any stock in said company was not liable for any of the indebtednesses sued upon.

From so much of the decree as adjudged that the complainants were not entitled to recover from the defendants, Brockhaus, Bishop, Patten, Vance and Lupton, and from so much of said decree as adjudged that Meehan was liable for debts incurred prior to August 15, 1921, and from so much of said decree as adjudged that the defendant, White, was liable only for debts incurred subsequent to January 1, 1923, or December 31, 1922, and from so much of said decree as refused to adjudge that said defendants were liable for all of the claims sued upon, the complainants have appealed to this court and have assigned errors. From so much of the decree as adjudged that the defendant, Meehan, was liable to the extent hereinbefore mentioned, said defendant, Meehan, has appealed to this court and has assigned errors.

In his memorandum opinion the Chancellor made an exceedingly lucid statement of the facts of this case. We quote from it as follows:

"Prior to the year 1919 the Montlake Coal Company had been conducting coal mining operations on the side and top of Signal Mountain in this County. Its principal stockholders were the defendants, Meehan and White, but there are a number of others. The late George D. Lancaster was one other. It owned or controlled as a subsidiary the Chattanooga & Montlake Railway Company. Its assets consisted of a railway connecting its mines on the top of Signal Mountain with the Cincinnati Southern Railway, the usual equipment for mining, including a commissary and some land which it

owned outright, but its principal asset was certain leases of coal land belonging to the Durham Coal & Iron Company. It had an indebtedness of something around $100,000.

"In 1919 the Suck Creek Coal Company was organized, originally with a comparatively small capital for the purpose of taking over and operating certain leases of coal lands which the defendant Hall had secured and which were situated not far from the property of the Montlake Coal Company. An agreement was entered into to merge the Montlake Coal Company, and the Chattanooga & Montlake Railway Company with the Suck Creek Coal Company, and for this purpose the authorized capital stock of the latter company was increased to $350,000. The Suck Creek Company was to take over all the properties of the other two companies and to assume $100,000 of the indebtedness of the Montlake Coal Company. Hall was to be paid $15,000 in cash and to receive $75,000 of the stock of the Suck Creek Company. The defendants. Brockhaus, Bishop, Patten, Vance and Lupton, also Lucey and Cantrell, subscribed for stock in the Suck Creek Coal Company, and paid a call for twenty-five per cent thereof, aggregating $10,000. It was found impossible, however, to sell enough stock of the Suck Creek Company to pay the indebtedness of the Montlake Company, and the proposed merger was abandoned or suspended.

"In this situation, one L. S. Berg and one J. M. Crossman, of New York, proposed to organize a corporation to be known as the Signal Mountain Coal (Mining) Company to take over the properties of said three corporations. On July 9, 1920, Berg, acting for himself and Crossman, entered into the following contract with the Suck Creek Coal Company, represented by Meehan as its president:

"This contract, made and entered into on this 9th day of July, 1920, by and between the Suck Creek Coal Company, party of the first part, and L. S. Berg, party of the second part.

## WITNESSETH:

"The party of the first part has this day bargained and sold, and agrees to transfer and convey unto the party of the second part all of the capital stock and all of the assets of The Suck Creek Coal Company, except certain leases to be hereinafter set out, and also all of the capital stock of Chattanooga & Montlake Railway Company, and the Montlake Coal Company, all for the following consideration:

"The said Berg and his associates are to organize a corporation to be known as Signal Mountain Coal Company, to take over all of the capital stock and property, and assets of all kinds of the Suck Creek Coal Company, except certain leases to be hereinafter mentioned. Also to take over and own all capital stock of the Chat-

tanooga & Montlake Railway Company and the Montlake Coal Company.

"It is understood that the party of the second part has the privilege of amending the charter of the Suck Creek Coal Company if he shall so elect.

"The said Berg is to pay to the said party of the first part the sum of $5,000 in cash, and the Signal Mountain Coal Company is to execute its promissory notes to said party of the first part for $25,000, due in one, two, three, four and five months, respectively, in equal installments, said notes to be dated so as to mature on the 20th of each month, respectively.

"The Signal Mountain Coal Company is to issue not in excess of $150,000 paid up preferred seven per cent cumulative non-participating stock, $141,600 of said preferred stock to be paid to the Suck Creek Coal Company as balance of the consideration of the purchase of said property and stock referred to.

"It is expressly understood and agreed that no mortgage or lien is to be made against this property until after all the preferred stock shall have been retired as hereinafter provided.

"Twenty per cent of the preferred stock of said Signal Mountain Coal Company is to be retired at the end of two years from this date; twenty per cent of said stock is to be retired at the end of three years; thirty per cent of said stock is to be retired at the end of four years from this date and the balance of said stock is to be retired at the end of five years from this date.

"The party of the first part hereby agreed to pay all the indebtedness of the Suck Creek Coal Company, Montlake Coal Company and the Chattanooga & Montlake Railway Company, as of this date, and protect the Signal Mountain Coal Company and its owners from liability therefrom.

"Within twelve months from this date the said Signal Mountain Coal Company is to deposit in some depository in Chattanooga, Tennessee, to be mutually agreed upon, at least $100,000 out of which fund there shall be expended such sums as can be judiciously and advantageously used in improving and developing the property purchased from the said Suck Creek Coal Company under this contract, and the property known as the Montlake property and Chattanooga & Montlake Railway Company.

"Only forty-nine per cent of the common stock of the Signal Mountain Coal Company is to be issued except as hereinafter provided. This forty-nine per cent is to be issued as it is subscribed and paid for. Of the capital stock of the Company, $2,000,000 is to be common stock.

"Fifty-one per cent of this is to be issued and deposited with Captain C. A. Lyerly, of Chattanooga, Tennessee, and shall be held

by him as trustee until the terms of this contract are carried out by said Signal Mountain Coal Company with reference to the deposit of $100,000 within one year, and the payment of said $25,000 in notes, as hereinbefore provided. When the said condition is complied with, said fifty-one per cent of the stock is to be delivered to L. S. Berg, or his assignee.

"It is thoroughly understood and agreed that the leases executed to the Montlake Coal Company and assigned by it to·the Suck Creek Coal Company are not to be assigned to Signal Mountain Coal Company. Said leases are to remain the property and to be controlled and owned by the Suck Creek Coal Company, the stock of which is to be transferred to the Signal Mountain Coal Company, as herein provided.

"Executed in duplicate on the day above set out."

"At the same time Berg and Crossman on the one part and Meehan, White and Lancaster entered into another contract, wherein Berg and Crossman undertook to guarantee the payment of the $425,000, of notes which the Signal Mountain Coal Company was to execute to the Suck Creek Coal Company, and Meehan, White and Lancaster on their part undertook to protect Berg and his associates and the Signal Mountain Coal Company against any liability resulting from the indebtedness of any of said three companies. Meehan, White and Lancaster further agreed that they would become directors of the Signal Mountain Coal Company for one year, and Meehan agreed to accept the presidency of the proposed corporation for one year.

"The contracts were ratified and approved by the stockholders of the Suck Creek Company and by its board of directors.

"The reason for including in this contract a transfer of the capital stock of the three companies and for excluding 'certain leases' was that the assent of the Durham Coal & Iron Co., the lessor, to an assignment was necessary and could not be obtained at that time, and it was considered essential that the corporate existence of the Montlake Company and the Suck Creek Company should be preserved, which would preserve the leases. However, the Durham Coal & Iron Company did subsequently give its assent to the assignment and the reason for transferring the capital stock of the Montlake Company was thus removed. It does not appear that there was ever any formal transfer or assignment of the capital stock of any of the three selling corporations to the Signal Mountain Coal Company. In fact it does not appear that there was ever any formal transfer or sale of the assets of the three original companies to the new corporation. Berg and Crossman simply seem to have taken charge of the properties on or about July 12, 1920. The Signal Mountain Coal Mining Company issued to the Suck Creek Company its notes

for $25,000, and issued to M. G. Y. Forman as trustee, certificates for its preferred stock in the sum of $141,600.

"Forman was secretary and treasurer of the Suck Creek Company and he became secretary and treasurer of the Signal Mountain Company. It does not appear that there was any instrument in writing to show upon what trusts the $141,600, of preferred stock was issued to him as trustee. There were several reasons for this procedure. In the first place, Crossman and Berg wanted this stock to be held as security that the Signal Mountain Company would be protected against the debts of the Montlake Company. In the next place Meehan and White were already sureties upon most of the debts of the Montlake Company and by their contract with Crossman and Berg they made themselves indemnitors to the new company against all the debts of the Montlake Company. In the third place there was a controversy between Hall on the one side and Meehan and White on the other as to the amount of the share that Hall was entitled to in this preferred stock. Hall was insisting that it should be distributed at once and he be given his proportionate amount; Meehan and White were insisting that the debts of the Montlake Company assumed by the Suck Creek Company should be first out of the proceeds of the preferred stock, and only the balance, if any, be distributed among the stockholders. They were all proceeding upon the assumption that the preferred stock would be reduced and paid off in five years as provided in the contract. It was conceded all around that Brockhaus and the other stock subscribers in his class should be first paid back the sums they had paid on their abortive subscriptions to stock in the Suck Creek Company.

"It was the expectation Meehan and White that the debts of the Suck Creek Company would be paid out of the $5,000 cash and the $25,000 in notes and the $141,600 of preferred stock to be redeemed as provided for in the contract with Berg. Berg and Crossman paid the $5,000 in cash and paid the $25,000 of notes (all except $1,000) and the same was applied upon the debts, but they never paid the principal of any of said preferred stock. They did pay some of the interest or dividends, and this was applied on the debts, but was later refunded to the Signal Mountain Company by Meehan and White.

"Meehan and White kept their agreement to protect the Signal Mountain Company from the debts of the Suck Creek Company or the Montlake Company. No claim was ever made against the Signal Mountain Company on account of any of those debts. However, those debts were not paid promptly, and the C. N. O. & T. P. Ry. Co. filed a bill in this court as a creditor in cause No. 18819, against Hall and others, which was finally sustained as a general creditor's bill to wind up the Suck Creek Company as an insolvent corporation. In this proceeding no attempt was made to reach the assets which had been

turned over to the Signal Mountain Company. It was conceded that the only asset which the Suck Creek Company had was the $141,600 of preferred stock in the Signal Mountain Company.

"It was further conceded that the defendants Brockhaus and the other defendants in his class were entitled to be refunded the amounts paid by them upon their abortive subscriptions to stock in the Suck Creek Company and an agreed order was made whereby said preferred stock to the amount of their respective payments on their subscriptions should be delivered to them.

"This is the history of how and in what manner Brockhaus et al., became the owners of preferred stock in the defendant corporation. And it is the whole history. *None of them ever took any part whatever in the business of that corporation.* Some of them even claim that they do not know whether they ever in fact received certificates for the stock to which by the terms of said order they were entitled. I do not think they are liable for any of the debts of the corporation, and the bill will be dismissed as to them.

"The balance of said preferred stock was sold under the order of the court in said No. 18819 as the property of the Suck Creek Company, and was purchased by Meehan and White for $5000. This sum was wholly inadequate to satisfy the debts of the Suck Creek Company. The sale included the entire balance of the preferred stock, and none of that stock was left to be distributed among the stockholders of that Company. Hall got no stock, and never took any part in the business of the Signal Mountain Company.

"The sale was made to Meehan and White on March 10, 1923, and was confirmed on April 17, 1923. Up to that time they did not in my opinion own said stock. It was owned by the Suck Creek Coal Company. Meehan and White had an interest in it, but their interest was that of stockholders of the Suck Creek Company and as sureties for the debts of that company, to secure the payment of which the preferred stock was placed in Foreman's name as trustee. It was held in the Equitable Trust Company case that one who holds stock in a corporation as collateral security and does not appear upon the books of the corporation as the owner is not a stockholder within the partnership doctrine. That doctrine is not to be extended by construction. It is true that Meehan and White contemplated the probability all along that they would have personally to pay the debts of the Suck Creek Company and that to protect themselves they would have to take over this stock (in fact by the time they purchased the stock they had paid over $90,000 of the debts) and it is true that in some of their letters appearing in the stipulation they referred to themselves as stockholders, at least Meehan did, by reason of their interest in this preferred stock. Nevertheless I do not think they became stockholders until they purchased said stock in March,

1923, and the sale confirmed. It is argued that the Suck Creek Company could not be the beneficial owner of the preferred stock standing in Forman's name because by the terms of the contract with Berg not only the physical assets of the Suck Creek Company but its capital stock as well, and this would make the latter company the owner of this preferred stock. Whether the shares of stock of the Suck Creek Company were ever actually transferred to the Signal Mountain Company does not appear, and I do not think the fact would make any difference. The assets constituted a fund first for the payment of its debts and then, if there had been any surplus for distribution among its stockholders and for this purpose the corporation continued to exist. Shan. Code, 2070-2073. The $141,600, of preferred stock constituted a part of the consideration for the transfer of the assets. In said cause No. 18819 the creditors elected to look to this stock instead of the physical assets. If in said cause, it had not been necessary to sell all of the preferred stock to pay debts, the surplus would have been for distribution pro rata among the stockholders, and it would have had to be determined how much was the share of each stockholder and how much, if any, Hall was entitled to These questions, however, were never decided because they became immaterial. But until Meehan and White purchased the stock in March, 1923, they were no more the owners of it than they were of the railway or the commissary or leases of the Suck Creek Company.

"Therefore, if this were all, I would hold that Meehan and White did not become liable for any of the debts sued on because they were all incurred before March, 1923.

"But pursuant to the collateral contract with Berg and Crossman of July 9, 1920, the defendant Meehan became the first president of the Signal Mountain Company. Perhaps it would be more accurate to say that he acted as such president because it does not appear from the proof in the cause that there ever was any election of officers or directors or any actual organization of the Signal Mountain Company in Delaware or anywhere else. What does appear is that Berg came here on or about the 12th of July, 1920, and took charge of the assets purchased from the Suck Creek Company. From that time on he and Crossman had entire control of said assets and proceeded to carry on business in the name of the Signal Mountain Coal Mining Company. Berg being on the ground and in active charge and Crossman making occasional visits here and sending directions, advice and money from New York. It does not appear that Meehan took any actual part in the carrying on of the business or in the making of any contract. This was in accordance with the original understanding. He was only to lend his "moral support" and in his letter of July 18, 1921, to Crossman, he claimed to have done that in every way possible. No doubt

this moral support was valuable to the company and gave it a standing which it would not have had if he had not been known as its president. It is not necessary to employ argument to show that one who holds himself out as the president of a corporation, which has no legal existence, performs an exceedingly important and indeed essential part in the activities of the association of individuals engaged in the enterprise of doing business in the corporate name. I am of the opinion that the defendant Meehan is liable for the obligations sued on which were incurred while he acted as president.

"I fix the period of his incumbency as August 15, 1921. This is the date of his letter to Crossman renouncing the position. I do not agree to the proposition that notwithstanding this letter he continued to be president until his successor was elected and qualified. In the first place the Statute relied on deals with State and not foreign corporations. And in the next place the basis for individual liability in such cases is participation in the business. It does not appear that Meehan ever held himself out as president after the date mentioned.

"As to the defendant, White. In the Memorandum in causes Nos. 20672 and 21341, there is a statement that White accepted the position as director in the Signal Mountain Company. But, while he agreed in the contract with Berg and Crossman to act as director for a year, the evidence in the present cause fails to show that he was ever elected to that position and he testifies without contradiction that he never received notice of such election and never attended or heard of a meeting of directors. And it does not appear that he took any part in the business of the company until the latter part of December, 1922.

"By that time the affairs of the company had gotten into a very bad way. It owed over $100,000, which it was unable to pay. It could not even pay its miners, and they had become in an ugly mood and were threatening injury to the mine properties. Berg left the State and apparently abandoned the business. In this situation Judge J. J. Lynch, at Crossman's instance, prevailed on White to take charge of the operations of the Company, which he did. In this he was, as he says, motivated by his wish to protect the interest of himself and Meehan in said preferred stock. He and Judge Lynch went to the mines and he persuaded the miners to resume work by promising them that he would see that they were paid their wages out of the first proceeds of the coal gotten out by them. In order to pacify the James Building Company in regard to the rent due it, he executed to it a mortgage of the company's office furniture and fixtures in the name of the Company. He set about obtaining from the creditors an agreement for an extension of time upon their debts, and obtained such an agreement from many of them but was

not successful with all. He managed the company until July, 1923, when further operations were abandoned because of the lack of funds. He expected to receive compensation for his services, but never did. But he was not a mere employe. I am of the opinion that as managing agent he took such part in the business of the company as made him liable for any debts incurred after December, 1922, and it will be so held."

We will first take up the assignments of error in behalf of the complainants. The first assignment makes the question that the Chancellor erred in holding that the defendants, Brockhaus, Bishop, Patten, Vance and Lupton, were not liable for the indebtednesses to complainants contracted in the name of said Signal Mountain Coal Mining Company.

Said defendants subscribed and paid for stock in the Suck Creek Coal Company. When they discovered that no one else would subscribe for stock in said company and that the same was a failure, they demanded their money back. This was promised to them and they probably thought they would get their money back out of the money that Messrs. Berg and Crossman and the Signal Mountain Coal Mining Company promised to pay under the terms of the contract of July 9, 1920. When they discovered that this money had been paid to more insistent creditors of the company's and that their only hope of regaining their money was to take preferred stock in the Signal Mountain Coal Mining Company, they agreed to do so. In the cause of C. N. O. & T. P. Railway Company v. Charles L. Hall, et al., No. 18,819, their stock was ordered to be and was delivered to them. This preferred stock had no voting power, and the owners thereof were not entitled to any voice in the affairs of the company. Neither Brockhaus nor any of the other defendants in this class had anything whatever to do with the activities of the Signal Mountain Coal Mining Company. They simply took said preferred stock as the only thing they could get for the money which they had paid into the Suck Creek Coal Company. They had no part whatever in the activities of the Signal Mountain Coal Mining Company. They had no vote at the stockholder's meetings of said company. As stated, they took no part in the activities of said company, and after reviewing the authorities cited in the briefs, we are convinced that the Chancellor was correct in decreeing in their favor.

The second assignment of error on behalf of the complainants is as follows:

"The Chancellor erred in holding that defendants, Meehan and White, did not become the owners of preferred stock of the Signal Mountain Coal Mining Company until they purchased it at a sale made under order of the court in March, 1923."

The $141,600 of stock which was issued to Mr. Forman, as trustee, was issued primarily for the benefit of the creditors of the Montlake Coal Company. Mr. Hall also had an interest in the issuance of this stock because he was looking to it in payment for his lease of the property. It is true that Messrs. White and Meehan were endorsers of the indebtednesses of the Montlake Company and that they were personally interested in the payment of this indebtedness, so as to relieve themselves. But this $141,600, less the $10,000, surrendered to Brockhaus, et al., was primarily a trust fund for the benefit of the creditors of the Suck Creek Company and the two other companies, i. e., Montlake Coal Company and Chattanooga & Montlake Railway Company. Said stock was never at any time turned over to the defendants, Meehan and White. At most they had only an equity in said stock. Their primary interest was to see to it that the dividends from said stock were paid to the old creditors of the Montlake Coal Company upon which indebtednesses they were endorsers.

They bought said stock at a court sale for the sum of $5,000, but it appears that neither of them ever actually received the stock and it is doubtful whether said stock was transferred upon the books of the company into their names.

Although, in a sense of the word, Meehan and White were interested in the affairs of the Signal Mountain Coal Mining Company, yet we agree with the Chancellor that neither of them ever became stockholders until their purchase at the court sale. And since, they never received their shares of stock and since it does not appear that either of them were ever named as stockholders upon the books of the company, we doubt whether they could ever be regarded as stockholders. Moreover, the record shows that neither of them acted as a stockholder or voted in a stockholder's meeting.

We are therefore, of the opinion that the Chancellor was correct in holding that neither Mr. Meehan nor Mr. White became owners of the stock of the Signal Mountain Coal Mining Company until they purchased it at the court sale in March, 1923.

The record, however, shows that Mr. Meehan acted as the president of the company from July 9, 1920, until August 15, 1921, and that the indebtedness of the complainant, Farrar Lumber Company, was contracted within this time. The record further shows that Mr. White acted as general manager and one of the officials of the company from the latter part of December, 1922, until the company ceased operations in 1923. Upon this basis the Chancellor held that Mr. Meehan was liable to the Farrar Lumber Company, and that Mr. White was liable to the London Guaranty & Accident Company.

When the $141,600, of stock in the Signal Mountain Coal Mining Company was issued, it was issued to Mr. Forman, as trustee. We

think the record shows that this stock was issued to Mr. Forman, as trustee, primarily for the benefit of the creditors of the Suck Creek Company; secondarily, perhaps, for the benefit of Mr. Hall, and in the last instance for the benefit of Messrs. Meehan and White. It never stood upon the books of the company in the name of Messrs. Meehan and White and they never in fact had possession of the stock certificates representing the same, although they paid the $5,-000, into court.

We have reviewed the authorities cited both pro and con upon the question of the liability of stockholders in a foreign non-domesticating corporation. After doing so, our opinion is that a stockholder who does not vote in a stockholder's meeting and who does not participate in the transaction of business in this State, cannot be held liable as a partner. But upon the other hand, one who acts as president, as Mr. Meehan did, and one who acts as general manager, as Mr. White did, participates in the business, and may be held liable, as the Chancellor, Judge Garvin, held.

Upon the other hand it is our opinion that innocent stockholders, such as Messrs. Brockhaus, Lupton, etc., who had nothing whatever to do with the transaction of the company's business within this State, cannot be held liable. They did not even vote in a stockholder's meeting.

The Chancellor held that Mr. Meehan, since he acted as president of the company from July 9, 1920, until August 15, 1921, was responsible for the debts of the company contracted during that date. This is the next question to be discussed within this opinion. Since Mr. Meehan acted as president during this term, and therefore participated in the affairs and business of the company, we think the Chancellor was correct in holding that he was liable for debts incurred within this period. However, the question arises that the indebtedness of the Farrar Lumber Company was one incurred without the State of Tennessee and within interstate commerce.

As we understand the record, it discloses that the Farrar Lumber Company was engaged in the manufacture and sale of lumber and patterns for houses; that on July 5, 1921, the Signal Mountain Coal Mining Company, through its then general manager, Mr. Berg, ordered a bill of lumber from said Farrar Lumber Company of Dalton, Georgia; that this order provided for the shipment of five houses; that the order required the lumber company of Dalton to deliver the materials upon the ground of the Montlake Coal Company at Montlake, Tennessee; that this was done; that after all of said lumber, etc., had been shipped the Signal Mountain Coal Mining Company gave to the Farrar Lumber Company its trade acceptances;

that these trade acceptances were returned by the collecting bank; that thereafter other trade acceptances were given, but that said trade acceptances, to the amount sued upon, were never paid.

Since the lumber was to be delivered upon the ground at Montlake, we believe that the contract was one to be performed within the State of Tennessee, and that the question of interstate commerce does not arise.

The assignments of error on behalf of Mr. Meehan make the question that the shipment of the lumber involved was an interstate transaction and that it arose prior to August 15, 1921—the date Mr. Meehan resigned. The assignments of error in behalf of Mr. Meehan make the question that particularly an item of $1,340.87, and interest thereon, was for lumber ordered subsequent to the date Mr. Meehan severed his relations with the Signal Mountain Coal Mining Company.

After examining the evidence, we are of the opinion that all of the lumber which the Farrar Lumber Company shipped and which is involved in this cause, was shipped pursuant to an order of July 5, 1921; that said shipment did not involve an interstate transaction, or a transaction outside of the State of Tennessee, for the reason that said lumber was to be placed upon the company's property at Montlake, and that the amount of said claim as fixed by the Master and concurred in by the Chancellor was correct. We have considered the contention that the acceptance or receiving of the trade acceptances wiped out and obliterated the original account upon which the Farrar Lumber Company sued. The rule of law is that the acceptance of notes or trade acceptances do not satisfy and extinguish the original account or claim. The presumption is that notes or trade acceptances are taken without the idea of abandoning or extinguishing the original claim. It may be true that circumstances may be looked to as showing by implication that a note or trade acceptance was taken in extinguishment of an account, but after examining the evidence in the cause at bar we do not believe that the acceptances in this instance were accepted in extinguishment of the account sued upon.

The remaining question is that the Clerk & Master and the Chancellor erred in allowing $1,340.87, of the claim of the Farrar Lumber Company. This was upon the ground that the shipment was subsequent to September 1, 1921, which was after the date that Mr. Meehan went out of office as president of the Company. We have examined the evidence and the correspondence of the parties, and after doing so, we are of the opinion that this shipment dates back to the original order of July 5, 1920, and that the Chancellor was correct in holding Mr. Meehan liable for the $1,340.87.

138

We do not think we should close this opinion without expressing our appreciation of the painstaking and accurate opinion of his Hon., Judge Garvin, and we concur in all of the facts which we found in his "memorandum." We think Judge Garvin ruled the case correctly, and his final decree will in all things be affirmed, with costs.

Portrum and Snodgrass, JJ., concur.